No. 12-14611

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

CSX Transportation, Inc.,

*Plaintiff-Appellant,*

vs.

Alabama Department of Revenue and Julie P. Magee, Commissioner
of the Alabama Department of Revenue,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of Alabama

BRIEF OF AMERICAN TRUCKING ASSOCIATIONS, INC.
AS *AMICUS CURIAE* IN SUPPORT OF APPELLEES

Richard Pianka
ATA Litigation Center
Prasad Sharma
American Trucking Associations, Inc.
950 N. Glebe Road
Arlington, Virginia 22203
Telephone: (703) 838-1889
Facsimile: (703) 838-1705
rpianka@trucking.org

*Attorneys for* Amicus Curiae *American Trucking Associations, Inc.*

CSX Transportation, Inc. v. Alabama Dept. of Revenue     No. 12-14611

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1–26.1-3, *amicus curiae* American Trucking Associations, Inc. ("ATA") certifies that the following individuals or entities (in addition to those listed in certificates included with previously-filed briefs) have an interest in the outcome of this case:

1. American Trucking Associations, Inc. ("ATA"), *amicus curiae*. ATA is a District of Columbia non-profit corporation with no parent corporation, and no publicly held corporation owns 10% or more of its stock.

2. ATA Litigation Center, attorneys for *amicus curiae* ATA.

3. Pianka, Richard, attorney for *amicus curiae* ATA.

4. Sharma, Prasad, attorney for *amicus curiae* ATA.

By:   /s/ Richard Pianka
     Richard Pianka
     Counsel for *amicus curiae*
     American Trucking Associations

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT ....................................... C-1

TABLE OF AUTHORITIES ....................................................................ii

IDENTITY AND INTEREST OF THE *AMICUS CURIAE* ...................... 1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ...................... 2

SUMMARY OF THE ARGUMENT ......................................................... 2

ARGUMENT ......................................................................................... 4

   I.   IN LIGHT OF THE STRUCTURE AND PURPOSE OF
      § 11501(B), A CLAIM OF DISCRIMINATION MUST BE EVA-
      LUATED AGAINST A STATE'S TAX TREATMENT OF
      COMMERCIAL AND INDUSTRIAL ENTITIES GENERALLY. ... 4

  II.  ALABAMA'S SALES AND USE TAX DOES NOT TARGET
      RAIL-ROADS FOR UNFAVORABLE TREATMENT COM-
      PARED TO GENERAL COMMERCIAL AND INDUSTRIAL
      ENTITIES.. ................................................................................. 10

CONCLUSION ...................................................................................... 13

# TABLE OF AUTHORITIES

**Cases**                                                        **Page(s)**

*Atchison, Topeka, and Santa Fe Ry. Co. v. Arizona,*
   78 F.3d 438 (9th Cir. 1996) .................................................................. 4

*Burlington Northern, Santa Fe Railway Co. v. Lohman,*
   193 F.3d 984 (8th Cir. 1999) ................................................................ 8

*CSX Transp., Inc. v. Ala. Dept. of Revenue,* __ F. Supp. 2d __,
   2012 WL 3775851 (N.D. Ala. Aug. 24, 2012) ............................. *passim*

*CSX Transp., Inc. v. Ala. Dept. of Revenue,*
   131 S. Ct. 1101 (2011) ............................................................... *passim*

*Department of Revenue of Oregon v. ACF Industries, Inc.,*
   510 U.S. 332 (1994) .............................................................................. 6

*Kansas City Southern Rwy. Co. v. McNamara,*
   817 F.2d 368 (5th Cir. 1987) ................................................. 7, 9, 10, 11

## Statutes

45 U.S.C. § 801(a) ...................................................................................... 8

49 U.S.C. § 11501(b)(1)-(3) ................................................................... 6, 7

49 U.S.C. § 11501(b)(4) .................................................................. *passim*

49 U.S.C. § 14502 .................................................................................. 4, 5

49 U.S.C. § 40116 ...................................................................................... 5

15 U.S.C. § 391 .......................................................................................... 5

## Other Authorities

Fed. R. App. P. 29(a)................................................................2

Fed. R. App. P. 29(c)(5)...........................................................2

H.R. Rep. No. 94-725, at 53 (1975)..........................................5

S. Rep. No. 94-499 (1975).......................................................5

## IDENTITY AND INTEREST OF THE *AMICUS CURIAE*

American Trucking Associations, Inc., ("ATA") is the national association of the trucking industry. Its direct membership includes approximately 2,000 trucking companies and in conjunction with 50 affiliated state trucking organizations, it represents over 30,000 motor carriers of every size, type, and class of motor carrier operation. The motor carriers represented by ATA haul a significant portion of the freight transported by truck in the United States and virtually all of them operate in interstate commerce among the states. ATA regularly represents the common interests of the trucking industry in courts throughout the nation.

ATA has a direct interest in this case because many of its members operate in interstate commerce to, from, within, and through the state of Alabama. ATA members purchase, store, and consume diesel fuel in Alabama. These members compete with railroad carriers in interstate commerce in Alabama, because shippers have the ability in many cases to choose between a rail carrier and a motor carrier when they ship property to, from, or through Alabama. As the district court concluded, under Alabama's current tax arrangements, both motor car-

riers and railroads pay a "substantially similar" tax rate on diesel fuel. *CSX Transp., Inc. v. Ala. Dept. of Revenue*, __ F. Supp. 2d __, 2012 WL 3775851 at *10 (N.D. Ala. Aug. 24, 2012). ATA's members depend on this level tax playing field to compete fairly with railroads in the provision of shipping services, and the preferential treatment CSX seeks here would amount to a substantial and unfair advantage.[1]

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

ATA adopts Appellees' Statement of the Issues Presented for Review.

## SUMMARY OF THE ARGUMENT

When it held that Alabama's sales and use tax does not discriminate against CSX within the meaning of 49 U.S.C. § 11501(b)(4), the district court reached that conclusion with reference to a "comparison class" consisting of "rail carriers' 'competing transportation modes.'" *CSX*, 2012 WL 3775851 at *5. It did so, however, not after concluding that this was the proper comparison as a matter of law, but simply be-

---

[1]    Both parties have consented to the filing of this *amicus* brief. *See* Fed. R. App. P. 29(a). No counsel for either party authored this brief in whole or in part, and no party, party's counsel, or person other than the *amicus*, its members, or its counsel contributed money that was intended to fund preparing or submitting this brief. *See* Fed. R. App. P. 29(c)(5).

cause "it appear[ed] both parties agreed" that this was the proper comparison. *Ibid.* As defendants have explained in detail, the district court's conclusion was correct under that comparison class assumption, and this Court should affirm on that basis. *See* Appellees' Br. at 16-34.

However, this case would be even simpler to resolve with reference to the class against which comparisons ought properly to be made when evaluating a claim under § 11501(b)(4): namely, the class of commercial and industrial entities generally subject to the taxing authority in question. Indeed, when the Supreme Court took up this case, restricting itself to the narrow question whether a § 11501(b)(4) claim could be premised on tax exemptions, Justices Thomas and Ginsburg agreed that it could. They dissented, however, because they would have reached the question of the proper comparison class, and their answer to that question would have paved the way to an alternative ground for affirmance. *See CSX Transp., Inc. v. Ala. Dept. of Revenue*, 131 S. Ct. 1101, 1114-15 (2011) (Thomas, J., dissenting); *see also* Appellees' Br. at 36-37.

## ARGUMENT

I. **IN LIGHT OF THE STRUCTURE AND PURPOSE OF § 11501(b), A CLAIM OF DISCRIMINATION MUST BE EVALUATED AGAINST A STATE'S TAX TREATMENT OF COMMERCIAL AND INDUSTRIAL ENTITIES GENERALLY.**

Congress has on a number of occasions legislated to prohibit states from discriminating against interstate commerce in their tax arrangements, each time focusing on the danger that states might seek to favor in-state interests over out-of-state businesses. Out-of-state businesses present attractive targets for revenue-hungry legislatures, because—unlike in-state businesses—they cannot themselves hold the legislature accountable. Congress's purpose in enacting these protections has not been to pick winners and losers among the out-of-state interests it sought to protect, but simply to "place them on an even playing field with other state taxpayers." *Atchison, Topeka, and Santa Fe Ry. Co. v. Arizona,* 78 F.3d 438, 442 (9th Cir. 1996).

The Railroad Revitalization and Regulatory Reform ("4-R") Act is but one statute in the broad structure of federal laws that limit state tax discrimination against industries operating primarily in interstate commerce. Congress has also enacted statutes protecting other such industries from discriminatory state taxes, including motor carriers (49

U.S.C. § 14502), air carriers (*id.* § 40116), and electricity (15 U.S.C. § 391). Each of these further Congress's goal (consistent with its power under the Commerce Clause) to prevent states from unduly burdening interstate commerce by shifting their revenue needs disproportionately on the backs of out-of-state commercial entities to whom they are not politically accountable.[2]

Rather than use the 4-R Act's antidiscrimination provision as a "shield" against this sort of state opportunism, CSX seeks to use it as a "sword" by which to obtain treatment *more* favorable than Alabama taxpayers at large. *See CSX Transp.*, 131 S. Ct. at 1119 (Thomas, J., dissenting). Their theory is that under § 11501(b)(4), railroads must receive *any* tax exemption enjoyed by *any* other entity, no matter how

---

[2]    As CSX itself put it, the antidiscrimination provisions of the 4-R Act were a response to Congress's conclusion that "railroads were often 'easy prey' for discriminatory state taxation. Appellant's Br. at 4. And as *amicus* Association of American Railroads explained when this case was before the Supreme Court, § 11501 was a response to the reality that "[t]axing interstate railroads to benefit local constituents is a difficult potion to resist," necessitating federal legislation "to check the impulse to pursue parochial state interests at the expense of the greater national good." Br. for *amicus curiae* Association of American Railroads at 8, *CSX Transp., Inc. v. Ala. Dept. of Revenue*, 131 S. Ct. 1101 (2011) (No. 09-520), 2010 WL 3316933 (Aug. 19, 2010) (citing S. Rep. No. 94-499, at 2-3 (1975), *reprinted in* 1976 U.S.C.C.A.N. 14, 15-16; H.R. Rep. No. 94-725, at 53 (1975)).

widely and evenhandedly applied the tax in question otherwise oper-
ates. But the Supreme Court expressly rejected any notion that the 4-R
Act could "turn railroads into 'most-favored-taxpayers'" like CSX de-
mands. *Id.* at 1109 n.8 (majority op.). As Justices Thomas and Ginsburg
explained, that unintended "most-favored-taxpayer" status is avoided
by focusing the § 11501(b)(4) inquiry on whether "a tax exemption
scheme * * * target[s] or single[s] out railroads *by comparison to general
commercial and industrial taxpayers. Id.* at 1115 (Thomas, J., dissent-
ing) (emphasis added). As those Justices further explained, nothing in
the majority's holding "foreclose[s]" such an approach. *Ibid.*

Justice Thomas's analysis began with the observation that "the
word 'discriminates' in subsection (b)(4) is ambiguous as to the compari-
son class." *Ibid.* Therefore, courts should look to the context of the term
to resolve its meaning, adopting a structural analysis much like the Su-
preme Court did to resolve the ambiguity at issue in *Department of
Revenue of Oregon v. ACF Industries, Inc.*, 510 U.S. 332 (1994). *See
CSX*, 131 S. Ct. at 1115-16 (Thomas, J., dissenting). And because sub-
section (b)(4) is "naturally appurtenant to subsections (b)(1) through
(3)," their consistent use of the identical term "discriminates" should in-

form the interpretation of that term in (b)(4). *Id.* at 1116.

As Justice Thomas recognized, "the 'discriminat[ion]' addressed in subsections (b)(1) through (3) can only be described as taxes that target or single out railroad property," and "affect [it] differently from the way they affect a larger class of comparative taxpayers' property." *Ibid.* "[I]t follows that, under subsection (b)(4), a tax 'discriminates against a rail carrier' if it similarly targets railroads for tax treatment less favorable than other commercial and industrial taxpayers." *Ibid.*

Justice Thomas's conclusions regarding the proper comparison class are consistent with the Congressional purpose discussed above: it works to prevent states from soaking the railroads by tying "their tax fate to the fate of a large and local group of taxpayers." *Kansas City Southern Rwy. Co. v. McNamara*, 817 F.2d 368, 375 (5th Cir. 1987). That tie establishes a substantial political check, because it means that in order to "overtax" the railroads states would have to similarly "overtax" resident businesses in general—resident businesses with the ability to hold the legislature accountable. Thus, absent any indication that the goals of (b)(4) are any different than those of (b)(1) through (3), it "should be understood to tackle the issue of systemic railroad over-

taxation the same way that the other subsections do— by linking the taxation of railroads to the taxation of businesses with local political influence." *CSX*, 131 S. Ct. at 1117 (Thomas, J., dissenting).

While the district court suggested that neither party disputed that the class of "competing transportation modes" was the proper comparison under the 4-R Act, 2012 WL 3775851 at *5, neither did either party appear to contend that, as a matter of law, § 11501(b)(4) demands such a comparison class.[3] In fact, CSX expressly argues that it does not: ra-

---

[3]    The use of an assumed "competitor" comparison class in the proceedings below likely reflects the approach taken in cases like *Burlington Northern, Santa Fe Railway Co. v. Lohman*, 193 F.3d 984 (8th Cir. 1999). In *Lohman*, the Eighth Circuit analyzed the railroad's antidiscrimination claim with reference to a "competitive mode" comparison class, rejecting a "broad" comparison class of commercial and industrial taxpayers generally. *Id.* at 986. It did so having concluded that the goal of the 4-R Act was not simply to provide a level playing field, but to affirmatively benefit the railroad industry by restoring its "financial stability." *Ibid.*

    To be sure, restoring railroad stability and competitiveness was an express purpose of the 4-R Act. *See, e.g.*, *CSX*, 131 S. Ct. at 1105 (citing 4-R Act § 101(a), 90 Stat. 33). And a number of provisions of the Act were aimed directly at furthering that goal, as the Act itself indicates. *See* 45 U.S.C. § 801(a) (listing, *inter alia*, "ratemaking and regulatory reform," expedited merger procedures, and "financing mechanisms" for rehabilitation and improvement of facilities as measures intended to "restore the financial stability of the railway system of the United States" and promote its revitalization). It does not follow from this, however, that every miscellaneous provision of the Act—including the tax discrimination provision at issue here—was intended by Congress to

<sub>(cont'd)</sub>

ther, CSX's contention is that "[t]he selection of the appropriate compar-ison class depends on the type of the tax and the discrimination chal-lenged in a particular case." Appellant's Br. at 24 n.13. In other words, in interpreting § 11501(b)(4), CSX believes that courts should refrain from applying a consistent, uniform analysis derived from the language, structure, and purpose of the antidiscrimination provisions of the 4-R Act; instead, they should adopt whatever shifting, ad hoc analysis would best serve the interests of the railroads in a given case.[4] Needless

---

promote the interests of the railroads over those of its transportation competitors. Quite the contrary, the fact that Congress also protected motor carriers and air carriers from state tax discrimination (*see* pp. 4-5, *supra*) is a sure sign that the 4-R Act's tax discrimination provision was not intended to give railroads favorable state tax treatment than its competitors. For this reason, focusing the § 11501(b)(4) comparison on transportation competitors merely serves as a distraction from Con-gress's goal of protecting railroads—along with other interstate indus-tries—from being taken advantage of vis-à-vis a state's taxpayers generally.

[4]    CSX presumably insists on this ad hoc approach because cases like *McNamara*—which CSX relies on heavily here—would have come out much differently if the 4-R Act demanded a comparison class of transportation competitors as a matter of law. *McNamara* involved a successful 4-R Act challenge to a "public utilities" tax assessed, *inter alia*, on rail carriers, bus lines, motor freight lines, and boat lines, but not on commercial interests generally. *See* 817 F.2d at 370. If the com-parison class used in that context had been the narrow class of trans-portation competitors, the railroad would have been unable to show discrimination because the challenged tax was applied evenhandedly among that group. But the railroad prevailed because the tax singled (cont'd)

to say, nothing in the statute suggests that Congress intended its meaning to shift from case to case in whatever direction favors the railroad plaintiff, and § 11501(b)(4) was unquestionably not meant to provide railroads with such a "windfall." *CSX*, 131 S. Ct. at 1109 n.8.

## II.   ALABAMA'S SALES AND USE TAX DOES NOT TARGET RAILROADS FOR UNFAVORABLE TREATMENT COMPARED TO GENERAL COMMERCIAL AND INDUSTRIAL ENTITIES.

Evaluated with the proper comparison class in mind, the question of whether Alabama's sales and use tax discriminates against the railroads is an easy one. CSX has not "allege[d] that railroads are targeted or singled out compared to commercial and industrial taxpayers generally." *CSX*, 131 S. Ct. at 1118 (Thomas, J., dissenting). It has alleged only that the exemption granted to two competitor industries with respect to a single commodity renders Alabama's sales and use tax dis-

---

out railroads (along with a small number of other entities) for treatment less favorable than that of the "large and local group of taxpayers," which—unlike those subject to the tax—had "the political and economic power to protect itself" in the state political process. *Id.* at 375.

CSX approves the Fifth Circuit's use of a broad comparison class in *McNamara*, contending that "[a]cceptance of that narrow group of taxpayers as the 'comparison class' would not illuminate the issue of discrimination" in the context of that case. Appellant's Br. at 24. Here, of course, their claim depends entirely on limiting the inquiry to just such a "narrow group." In other words, CSX appears to believe that courts should apply the principle "heads I win, tails you lose" when deciding what comparison the 4-R Act demands.

criminatory against railroads under § 11501(b)(4). The district court and the defendants have explained that—even if that were the appropriate comparison—the differential treatment is justified and therefore does not constitute discrimination. *See* 2012 WL 3775851 at *9-*13; Appellees' Br. at 16-34.

But even more fundamentally, "[d]iscrete exceptions for certain railroad competitors—namely, fuel exceptions for interstate motor carriers and interstate ships and barges—do not make a generally applicable tax 'discriminat[ory]' under subsection (b)(4)," even if, under the Supreme Court's holding, *widespread* exemptions might. *CSX*, 131 S. Ct. at 1118 (Thomas, J., dissenting). The simple fact that railroads pay the same sales and use tax as the broad class of Alabama taxpayers is sufficient to protect the railroads from discrimination by tying "their tax fate to the fate of" in-state taxpayers who can hold the legislature accountable. *McNamara*, 817 F.2d at 375. Alabama's decision to exempt motor carriers from that tax—for the entirely sensible reason that they pay a *different* tax that is comparable in amount, 2012 WL 3775851 at *10—does not present a risk that Alabama is trying to soak the out-of-state railroads for a disproportionate share of the overall tax burden.

The notion that Alabama's motor carrier exemption is part of a scheme to discriminate *against* the railroads is belied by the basic facts. As the district court concluded, given the excise tax on diesel fuel paid by motor carriers (but not railroads), the per-gallon diesel tax rate on motor carriers and railroads is "substantially similar." 2012 WL 3775851, at *10. But because motor carriers pay a fixed 19 cent/gallon excise tax while railroads pay a 4% sales and use tax, whether one industry or the other will pay a greater per-gallon effective tax rate will vary with the retail price of diesel. And, as the district court further observed, while there have been time periods in which railroads paid more in per-gallon taxes than motor carriers (when factoring in local sales and use taxes), for much of the time period in evidence the *reverse* was true. *Ibid*. And *without* factoring in local taxes—that is, looking only at the taxes imposed by the Alabama legislature itself and administered by the Department of Revenue—motor carriers consistently paid *more* per gallon in taxes than railroads during the period in question. *Ibid*. That is, Alabama's system of taxing diesel purchases by motor carriers and railroads does not consistently result in railroads paying more tax per gallon than motor carriers. If Alabama wished to discriminate

against vulnerable railroads by forcing them to pay more than their fair share of diesel taxes, it surely would have done so in such a way as to *consistently* disfavor them. As the district court concluded, there is simply no suggestion of "favoritism" in Alabama's tax arrangements. *Ibid.*

Absent any reason to think that Alabama's sales and use tax targets railroads for unfavorable treatment or burdens them more than taxpayers in general, this Court should follow the suggestion of Justices Thomas and Ginsburg in concluding that CSX has failed to state a claim under § 11501(b)(4). To do otherwise would be to go far beyond Congress's intent and effectively render the 4-R Act's antidiscrimination provisions a "most-favored-taxpayer" directive, entitling the railroads to challenge any and every tax exemption or tax break a state gives to any other entity. *See CSX*, 131 S. Ct. at 1109 n.8. This Court should decline CSX's invitation to open that door to them.

## CONCLUSION

The decision of the district court should be affirmed.

Dated:   November 20, 2012          Respectfully submitted,

/s/ Richard Pianka
Richard Pianka
ATA Litigation Center
Prasad Sharma
American Trucking Associations, Inc.
950 N. Glebe Road
Arlington, Virginia 22203
Telephone:  (703) 838-1889
Facsimile:  (703) 838-1705
rpianka@trucking.org

*Attorneys for Amicus Curiae*
American Trucking Associations, Inc.

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 2,919 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Century font.

DATED: November 20, 2012

/s/ Richard Pianka
Richard Pianka
*Attorney for Amicus Curiae*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 20, 2012, the foregoing brief was filed by depositing the original document and six copies in the United States mail, properly addressed and postage pre-paid, to the Clerk of the Court, and has been served upon the following counsel of record by electronic mail and by depositing two copies in the United States mail, properly addressed and postage pre-paid, to:

James W. McBride
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
920 Massachusetts Avenue NW
Suite 900
Washington, DC 20001

Margaret Johnson McNeill
Assistant Attorney General
State of Alabama and Assistant Counsel
Department of Revenue
P.O. Box 320001
Montgomery, Alabama 36132-0001

Betty Jo Christian
Steptoe & Johnson LLP
1330 Connecticut Avenue NW
Washington, DC 20036

DATED: November 20, 2012

/s/ Richard Pianka
Richard Pianka
*Attorney for Amicus Curiae*