[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-14611
_____

D.C. Docket No. 2:08-cv-00655-AKK

CSX TRANSPORTATION, INC.,

Plaintiff - Appellant,

versus

ALABAMA DEPARTMENT OF REVENUE,
COMMISSIONER, ALABAMA DEPARTMENT OF REVENUE,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(July 1, 2013)

Before WILSON and COX, Circuit Judges, and BOWEN,[*] District Judge.

WILSON, Circuit Judge:

The State of Alabama (State) imposes a 4% sales tax on the gross receipts of retail businesses, and a 4% use tax on the storage, use, or consumption of tangible personal property. *See* Ala. Code §§ 40-23-2(1), -61(a).[1] Appellant CSX Transportation, Inc. (CSX), an interstate rail carrier, pays the 4% sales tax whenever it purchases diesel fuel in the State. CSX's main competitors in the State—interstate motor and water carriers—do not. In this appeal, we must decide whether exempting CSX's main competitors from the State's sales tax is discriminatory as to rail carriers in violation of the Railroad Revitalization and Regulation Reform Act of 1976 (4-R Act), 49 U.S.C. § 11501(b)(4). We conclude that the sales tax is indeed discriminatory and that the State has not offered a "sufficient justification" for exempting CSX's competitors. *See CSX Transp., Inc. v. Ala. Dep't of Revenue* (*CSX II*), ⸺ U.S. ⸺, 131 S. Ct. 1101, 1109 n.8 (2011) ("Whether the railroad will prevail . . . depends on whether the State offers a sufficient justification for declining to provide the exemption at issue to rail carriers."). Accordingly, we reverse.

---

[*] Honorable Dudley H. Bowen, Jr., United States District Judge for the Southern District of Georgia, sitting by designation.

[1] For purposes of clarity, both taxes will be referred to as the "sales tax."

2

# I.  BACKGROUND

Rail carriers, motor carriers, and water carriers all compete for the shipment of freight in interstate commerce.  Although all three purchase diesel fuel toward that end, the State taxes each competitor's purchases differently: water carriers pay no tax whatsoever on their diesel fuel purchases, *see* Ala. Code § 40-23-4(a)(10); rail carriers pay the State's 4% sales tax; and motor carriers pay an excise tax of 19¢ per gallon, *see* Alabama Terminal Excise Tax Act (fuel excise tax), 2011 Ala. Act 565 (effective October 2012).[2]

The State distributes the revenue from the fuel excise tax as follows: for every gallon sold, 13¢ goes to the Alabama Department of Transportation for the construction, repair, maintenance, and operation of public roads and bridges, and the payment of principal and interest on highway bonds; the remaining 6¢ goes to cities and counties for the construction and maintenance of roads and bridges, and to the Department of Transportation for general highway purposes.  Revenue from the sales tax, on the other hand, goes toward a general revenue fund.  *See* Ala. Code §§ 40-23-35, 40-23-85.

---

[2] During the majority of this litigation, the State codified its fuel excise tax at section 40-17-2 of the Alabama Code.  In October 2012, the State repealed that section and modified its motor fuel tax scheme.  *See* Alabama Terminal Excise Tax Act, 2011 Ala. Act 565 (effective October 2012).  The new statute changes the timing of the tax's imposition, but the amount of the excise tax (19¢/gallon of diesel fuel) remains the same, and it still exempts motor carriers from paying the State's sales tax on diesel-fuel purchases.  For purposes of clarity, both taxes will be referred to as the "fuel excise tax."

It is axiomatic that a state has broad discretion in the exercise of its taxing power.  *See Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 359, 93 S. Ct. 1001, 1003 (1973); *Weissinger v. White*, 733 F.2d 802, 805 (11th Cir. 1984). That discretion will be reined in, however, where it offends a "specific federal right."  *Lehnhausen*, 410 U.S. at 359, 93 S. Ct. at 1003.  At issue here are the federal rights Congress has afforded rail carriers pursuant to the 4-R Act.  That Act provides that a state may not:

> (1) Assess rail transportation property at a value that has a higher ratio to the true market value of the rail transportation property than the ratio that the assessed value of other commercial and industrial property in the same assessment jurisdiction has to the true market value of the other commercial and industrial property.

> (2) Levy or collect a tax on an assessment that may not be made under paragraph (1) of this subsection.

> (3) Levy or collect an ad valorem property tax on rail transportation property at a tax rate that exceeds the tax rate applicable to commercial and industrial property in the same assessment jurisdiction.

> (4) *Impose another tax that discriminates against a rail carrier providing transportation subject to the jurisdiction of the Board under this part.*

49 U.S.C. § 11501(b) (emphasis added).

Enacted to "restore the financial stability of the railway system of the United States," the 4-R Act "target[s] state and local taxation schemes that discriminate against rail carriers."  *CSX II*, 131 S. Ct. at 1105 (internal quotation marks

omitted).  CSX contends that the State's sales tax discriminates against it in violation of § 11501(b)(4) because CSX's main competitors do not pay the sales tax when they purchase diesel fuel, giving them a competitive advantage over CSX.

CSX filed this lawsuit against Alabama's Department of Revenue and its Commissioner in 2008.  After the district court dismissed the complaint, we affirmed the dismissal based on our precedent in *Norfolk Southern Railroad Co. v. Alabama Department of Revenue*, 550 F.3d 1306, 1316 (11th Cir. 2008), which established the rule that a railroad could not challenge its competitors' exemptions from a sales tax as discriminatory under the 4-R Act.  *See CSX Transp., Inc. v. Ala. Dep't of Revenue* (*CSX I*), 350 F. App'x 318, 319 (11th Cir. 2009) (per curiam). CSX appealed, and the Supreme Court granted certiorari, overruled our decision in *Norfolk*, and held that "CSX may challenge Alabama's sales  and use taxes as tax[es] that discriminat[e] against rail carrier[s] under § 11501(b)(4)." *CSX II*, 131 S. Ct. at 1114 (alterations in original) (internal quotation marks omitted).  The Court appeared to impliedly assume that the State's exemptions for CSX's competitors would be discriminatory unless "the State offers a sufficient justification for declining to provide the exemption at issue to rail carriers." *Id.* at 1109 n.8.

After we remanded the case back to the district court, the court conducted a bench trial and issued an order holding that the State's sales tax did not discriminate against CSX in violation of § 11501(b)(4). *See CSX Transp. Inc. v. Ala. Dep't of Revenue* (*CSX III*), 892 F. Supp. 2d 1300, 1317 (N.D. Ala. 2012). The district court reasoned that because the State's motor carriers paid a roughly equivalent amount in taxes pursuant to the State's fuel excise tax, the motor carriers' exemption from the sales tax was not discriminatory. *Id.* at 1313 (finding that "the tax rate imposed per gallon of diesel fuel for rail carriers and motor carriers is essentially the same"). As to the water carriers, the district court held that CSX had offered "no evidence regarding the purported discriminatory effect as it relates to water carriers." *Id.* at 1316. The district court dismissed the matter, and this appeal followed.

## II.  ANALYSIS

We review the district court's application of the 4-R Act de novo, *see Alphamed, Inc. v. B. Braun Med., Inc.*, 367 F.3d 1280, 1285 (11th Cir. 2004), taking special heed of the guidance provided by the Supreme Court in *CSX II*. "'Discrimination,'" the Court wrote, "'is the failure to treat all persons equally when no reasonable distinction can be found between those favored and those not favored.'" *CSX II*, 131 S. Ct. at 1108 (quoting Black's Law Dictionary 534 (9th ed. 2009)). For example, "[t]o charge one group of taxpayers a 2% rate and

6

another group a 4% rate, if the groups are the same in all relevant respects, is to discriminate against the latter." *Id.* A tax exemption is analogous because the "State takes the favored group's rate down to 0%." *Id.* Therefore, *CSX II*'s holding suggests that a tax exemption disfavoring a rail carrier creates a rebuttable presumption of discrimination, unless the State can "offer[] a sufficient justification for declining to provide the exemption at issue to rail carriers." *Id.* at 1110 n.8.

## A. Comparison Class

Before we address whether the exemption at issue is discriminatory, there remains a first-order question that the Court left untouched and has yet to be answered in this circuit: against what do we compare the railroads? The matter is one of scope, as any model of discrimination requires a fixed set of participants. If we compare CSX to all of the State's taxpayers, it is no worse off because most taxpayers pay the sales tax when they purchase diesel fuel. On the other hand, if we compare CSX to motor and water carriers, questions of favorable treatment arise because they do not pay the sales tax. Among our sister circuits there are essentially two camps: the functional approach and the competitive approach.

We acknowledge that the question of the proper comparison class has not been the central inquiry of this appeal. In the proceedings below, the district court and the parties adopted the competitive approach, assuming that CSX must be

7

compared with only motor and water carriers.  Although we ultimately conclude

that the competitive approach is appropriate in this circumstance, we are obliged to

say a few words concerning the diversity of opinions on this matter.

Employing the functional approach, the Seventh and Ninth Circuits have

compared the rail carriers to other "commercial and industrial" taxpayers based on

§ 11501(b)(4)'s three preceding subsections, which all contain the phrase

"commercial and industrial."  *See Kansas City S. Ry. Co. v. Koeller*, 653 F.3d 496,

508 (7th Cir.), *cert. denied*, 132 S. Ct. 855 (2011); *Atchison, Topeka & Santa Fe*

*Ry. Co. v. Arizona*, 78 F.3d 438, 441 (9th Cir. 1999).  For example, in *Koeller* the

Seventh Circuit considered whether an Illinois subdivision's method of calculating

taxes discriminated against railroads in violation of § 11501(b)(4).  Seven hundred

taxpayers comprised the tax base of the subdivision: eight of the 700 taxpayers

were railroads, pipelines, and utilities (RPU properties).  *Koeller*, 653 F.3d at 500.

Of the remaining 692 taxpayers, 14 conducted commercial and industrial

operations, several were residents, and the vast majority used the land for

agricultural purposes.  *Id.*  After severe floods and an increase in the price of diesel

fuel sent the subdivision into a budgetary crisis, its commissioners increased the

annual maintenance assessment—which for all intents and purposes was a "tax."

*Id.*  Although the majority of the subdivision's landowners saw modest hikes in

their annual assessments, the RPU properties saw "astronomical increase[s]."  *Id.*

8

at 502.  Norfolk Southern's assessment, for instance, jumped a whopping 8,300% in one year, from $1,126 to $93,920.  *Id.*

Before reaching the question of whether the tax was discriminatory, the Seventh Circuit acknowledged the different comparison-class options at its disposal.  The court opted for the functional approach, in part because of "the need to read subsection (b)(4) in light of the approach taken in the first three subsections of the 4-R Act, which all directly or indirectly look to other commercial and industrial property."  *Id.* at 509 (internal quotation marks omitted).  Yet the Seventh Circuit also recognized that "there are *no* competitors of the railroads— motor carriers, air carriers, barges, [or] Great Lakes ships—that [the subdivision] is trying to tax."  *Id.* (alteration in original) (emphasis in original) (internal quotation marks omitted).  Therefore, opting for the competitive approach in *Koeller* would have yielded the bizarre result that a tax singularly raising a rail carrier's tax rate by 4,800% was not discriminatory.  With that in mind, the court compared the rail carriers with "the 14 additional commercial and industrial taxpayers" who did not suffer such a dramatic increase in their tax obligations, and held that the tax was discriminatory.  *Id.* at 509–10.

Contrarily, the Eighth Circuit has endorsed the narrower "competitive approach" model, at least when considering a state's sales tax.  *See Union Pac. R.R. Co. v. Minn. Dep't of Revenue*, 507 F.3d 693, 695 (8th Cir. 2007); *Burlington*

9

*N., Santa Fe Ry. Co. v. Lohman*, 193 F.3d 984, 986 (8th Cir. 1999) (choosing the competitive model, but acknowledging that "the comparison class should be appropriate *to the type of tax and discrimination* challenged in a particular case" (emphasis added)).  In *Lohman*, the Eighth Circuit addressed a scenario identical to the one before us: whether an exemption to Missouri's sales tax caused the sales tax to violate § 11501(b)(4).  *See Lohman*, 193 F.3d at 984.  In that case too, motor carriers paid a fuel excise tax rather than a sales tax.  *Id.* at 985.  The court ultimately held that "the proper comparison class for Missouri sales and use taxes is the competitive mode."  *Id.* at 986.  Paying homage to the 4-R Act's broad purpose of restoring the railroads' financial stability, the court emphasized that "[s]tability cannot be restored without making the railroads competitive."  *Id.* Furthermore, the court continued, if Congress "had wanted [§ 11501(b)(4)] to have the same comparison class as the property tax subsections, and none other, it would have written it that way."  *Id.*; *see also Atchison*, 78 F.3d at 445 (Nielsen, J., dissenting) ("If Congress wanted [§ 11501(b)(4)] to share the same broad comparison class as the three preceding subsections, and none other, it would have said so.  It did not.").  This result made sense, the court reasoned, because a broad comparison class in that instance would have put the railroads "at a competitive disadvantage."  *Lohman*, 193 F.3d at 986.

10

We have carefully studied the different approaches available to us, and we conclude that in light of the 4-R Act's purpose of ensuring "financial stability" for rail carriers, the competitive model best serves that goal in the context of a state's sales tax on diesel fuel.[3]  Moreover, CSX and the State stipulated, and the district court agreed, that the proper comparison class for this case was CSX's competitors.[4]  Having determined that the appropriate comparison class is CSX's competitors, we turn to the question of whether the sales tax is discriminatory.

## B. Discrimination

As noted earlier, the Supreme Court held that tax exemptions can be discriminatory under the 4-R Act.  *CSX II*, 131 S. Ct. at 1114.  Given that we have opted for a competitive model in this case, and CSX's competitors do not pay the State's sales tax, we hold that CSX has established a prima facie case of

---

[3] We therefore decline to adopt Justices Thomas's dissent in *CSX II*, which would have held that the appropriate comparison class in all 4-R Act discrimination cases is all commercial and industrial taxpayers.  *See CSX* II, 131 S. Ct. at 1115 (Thomas, J., dissenting) ("I would hold that, to violate § 11501(b)(4), a tax exemption scheme must target or single out railroads by comparison to general commercial and industrial taxpayers.").  While this comparison class might be appropriate in certain situations, like *Koeller*, it fails to address discriminatory taxes that place rail carriers at a significant disadvantage vis-à-vis their competitors.

[4] Our approach creates tension with the Seventh Circuit's holding in *Koeller* only to the extent that *Koeller* established a bright-line rule for § 11501(b)(4) cases.  *See Koeller*, 653 F.3d at 509 ("Given our preference for clarity, however, rather than an ill-defined 'all the circumstances' type of test, we are content for now to endorse reference to other commercial and industrial users.").  While we recognize the virtues of bright-line rules, § 11501(b)(4) is a broad statute, designed to strike down all discriminatory taxes that place rail carriers at a competitive disadvantage—and Congress "specifically chose to omit any reference to a comparison class in subsection [(b)(4)]."  *Atchison*, 78 F.3d at 445 (Nielsen, J., dissenting).  Thus, while a malleable approach might not lend itself to the most efficient application, the language and purpose of § 11501(b)(4) require that "the comparison class should be appropriate to the type of tax and discrimination challenged in a particular case."  *Lohman*, 193 F.3d at 986.

discrimination.  Quite simply, the sales tax overburdens the rail carriers because its competitors do not pay it.  It therefore becomes the State's burden to justify its discriminatory tax.  *See id.* at 1110 n.8.

The State devotes the majority of its brief to defending the motor carriers' exemption to the sales tax on the ground that the motor carriers pay a roughly equivalent amount of taxes under the fuel excise tax.  This argument misses the mark.  Rather than framing the tax in question at its highest level of abstraction as "all the taxes paid on diesel-fuel purchases," we agree with the Eighth Circuit that "we look only at the sales and use tax with respect to fuel to see if discrimination has occurred."  *Union Pacific*, 507 F.3d at 695 (internal quotation marks omitted). We are persuaded that even though in some years—depending on the price of diesel fuel—the State's taxing arrangement might yield a fair result, "the actual fairness of those arrangements is too difficult and expensive to evaluate."  *Lohman*, 193 F.3d at 986 (quoting *Trailer Train Co. v. State Tax Comm'n*, 929 F.3d 1300, 1303 (8th Cir. 1991)).

This construction of the 4-R Act finds support in the Act's text.  Section 11501(b)(4) prohibits the states from "impos[ing] another tax that discriminates against a rail carrier," but the statute hardly "suggests that an individually discriminatory tax should be assessed for fairness against the entire tax structure of the state."  *Kansas City S. Ry. v. McNamara*, 817 F.2d 368, 377 (5th Cir. 1987).  If

the 4-R Act required us to examine the tax regime for an entire commodity, it would have said so rather than speaking in the singular about "another tax." Like the Eighth Circuit in *Lohman*, we find the Fifth Circuit's well-reasoned opinion in *McNamara* to speak directly on this issue.

In *McNamara*, the Fifth Circuit struck down a Louisiana tax imposed on transportation and communication utilities, which included rail carriers. *Id.* at 370. Using a commercial and industrial taxpayer comparison class, the Fifth Circuit held that the tax was discriminatory, and that Louisiana could not justify it based on the fact that other commercial and industrial taxpayers paid a roughly equivalent amount in sales and use taxes. *Id.* at 377. Refusing to consider the sales tax, the Fifth Circuit held that "[d]etermining the intrinsic economic fairness of a tax system to a particular taxpayer is a paradigm of the kind of polycentric problem for which courts are ill-suited." *Id.*

*McNamara* provided the rationale for the Eighth Circuit in *Lohman* and its progeny to hold that courts should not evaluate a state's sales tax against other taxes in the state's code. *See Lohman*, 193 F.3d at 986. Here, the district court below rejected the Eighth Circuit's reliance on *McNamara* because *McNamara* employed the functional approach rather than the narrower competitive approach, and when the comparison class is thereby "drastically reduced" it does not "impose substantial theoretical and practical difficulties on a court." *CSX III*, 892 F. Supp.

13

2d at 1311.  Because the comparison class has been narrowed, the dissent assures us, federal courts would not engage in "such a searching, time-consuming, expensive, and impracticable analysis."  Dissenting Op. at 6.  We disagree.

Although the class of taxpayers might have been narrower had we opted for the functional approach, the "theoretical difficult[ies]" that concerned the *McNamara* court would remain.  *McNamara*, 817 F.2d at 377.  We would still be forced to decide whether a state's fixed-percentage sales tax for one market participant is roughly equivalent to an *ad valorem* excise tax for another market participant.  In addition, the authoritative value of that assessment would ebb and flow with every oscillation in diesel fuel's market value—we would operate for some months, perhaps even years, under the fiction that the two taxes are equivalent.[5]  *Id.* ("Furthermore, there is no reason in principle why the railroads could not sue for such a judicial assessment *each year* (or for each tax bill) because the dynamic nature of any state's economy will alter the relative benefits and burdens of its tax system from moment to moment." (emphasis in original)).  And if the price of diesel fuel causes rail carriers to bear a significantly larger tax burden than its competitors, at what point must we reverse course and hold that the

---

[5] The dissent also points out that under today's holding, "the sales and use taxes would discriminate against a rail carrier even if its competitors paid four times as much tax as the rail carrier for the same commodity."  Dissenting Op. at 7–8.  But if we were to adopt the dissent's approach and accept the State's justification for its discriminatory tax—that motor carriers pay some other commodity tax, that is sometimes equivalent—the reverse would also be true.  That is to say, the sales and use tax exemption *would not* discriminate against a rail carrier even if its competitors paid four times *less* in tax as the rail carrier for the same commodity.

sales tax is discriminatory?  After one year of inequity?  Three?[6]  To adjust the

comparison class makes little difference, and it behooves us to bear in mind the

words of the Supreme Court:

> [C]ourts as institutions are poorly equipped to evaluate with precision
> the relative burdens of various methods of taxation.  The complexities
> of factual economic proof always present a certain potential for error,
> and courts have little familiarity with the process of evaluating the
> relative economic burden of taxes.

*Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 589–

90, 103 S. Ct. 1365, 1374 (1983) (footnote omitted).

 We therefore decline to undertake the Sisyphean burden of evaluating the

fairness of the State's overall tax structure in order to determine whether a single

tax exemption causes a state's sales tax to be discriminatory.  This case, then,

becomes much simpler than it would appear at first blush.  Rail carriers pay the

State's sales tax—motor and water carriers do not.  It is not a sufficient

justification for the State to counter that its tax code will ultimately level the

playing field.

Even if it were true that the exemptions at issue were not enacted to

unfavorably target rail carriers, our decision would be the same because

discrimination under § 11501(b)(4) "can be shown even if there is no direct

---

[6] This is to say nothing of the added value that the motor carriers receive from being able
to accurately forecast their year-to-year tax burden by virtue of being subject to a fixed excise tax
rather than a variable *ad valorem* tax.

evidence of targeting," as long as the tax imposes a proportionately heavier burden on rail carriers. *Koeller*, 653 F.3d at 510. Here, the rail carriers' main competitors have received favorable treatment: tax exemptions. In response, the State offers no "reasonable distinctions between the favored and the disfavored"; therefore it has failed to carry the burden set forth by the Supreme Court in *CSX II*. *Id.* In *CSX II*, the Supreme Court queried the State: "Can you justify why motor and water carriers are taxed differently than rail carriers?" The State responds: "Motor and water carriers are taxed differently because they are taxed differently." But the Supreme Court demanded a justification from the State, not a Zen proverb. Section 11501(b)(4) does not allow us to sit idly by and take the State at its word that, in the long run, its tax code will burden CSX no more than its competitors. Moreover, no one can seriously dispute that the water carriers, who pay not a cent of tax on diesel fuel, are the beneficiaries of a discriminatory tax regime.

### III. CONCLUSION

In short, after establishing a comparison class of competitors and showing that its competitors did not pay the sales tax on diesel fuel purchases, CSX made a prima facie showing of discrimination under § 11501(b)(4). The burden shifted to the State to provide a "sufficient justification" for the exemptions. It did not. We reverse the district court, hold that the State's sales tax violates the 4-R Act, and

16

remand to the district court with instructions to enter declaratory and injunctive relief in favor of CSX consistent with this opinion.

**REVERSED AND REMANDED.**

COX, Circuit Judge, dissenting:

I dissent.  Though I agree that the appropriate comparison class consists of the stipulated competitors, I do not agree that a tax exemption for interstate motor carriers discriminates against interstate rail carriers when motor carriers in fact carry a similar or heavier tax burden for purchase of the same commodity.  As for the tax exemption for interstate water carriers, I conclude that the district court improperly placed the burden on CSX to provide evidence of the exemption's discriminatory effect.  I would affirm the district court's ruling to the extent that it finds no violation of the 4-R Act with respect to the motor carriers' exemption but remand for reconsideration as to interstate water carriers.

The Railroad Revitalization and Regulatory Reform Act of 1976 (the 4-R Act) prohibits a state taxing authority from taking certain actions that place unfair burdens on railroads.  The statute's first three subsections bar a state from making unfair assessments on railroad property, collecting a tax on such unfair assessments, and collecting an *ad valorem* property tax at a rate greater than that imposed on other "commercial and industrial property," 49 U.S.C. § 11501(b)(1)–(3).[1]  At issue in this case is § 11501(b)(4), which prohibits a state and its

---

[1] Section 11501(b)(1)–(3) reads:

(b) The following acts unreasonably burden and discriminate against interstate commerce, and a State, subdivision of a State, or authority acting for a State or subdivision of a State may not do any of them:

18

subdivisions from "[i]mpos[ing] another tax that discriminates against a rail carrier." *Id.* § 11501(b)(4).

We use a two-step inquiry to evaluate a claim of discrimination in violation of § 11501(b)(4). *See CSX Transp., Inc. v. Ala. Dep't of Revenue*, 131 S. Ct. 1101, 1109 n.8 (2011) (*CSX II*). The plaintiff railroad (CSX here) has the initial burden to establish a prima facie case of discriminatory tax treatment. If the plaintiff does so, the burden shifts to the defendant taxing authority (the State here) to establish that the differential tax treatment is justified and does not discriminate against the railroad. *Id.* ("Whether the railroad will prevail—that is, whether it can prove the alleged discrimination—depends on whether the State offers a sufficient justification for declining to provide the exemption at issue to rail carriers."). If the defendant cannot meet its burden, the tax treatment violates § 11501(b)(4).

The parties in this case have agreed that CSX's competitors are interstate motor carriers ("on-highway motor carriers of property in interstate commerce") and interstate water carriers ("carriers of property in interstate commerce by ships,

---

(1) Assess rail transportation property at a value that has a higher ratio to the true market value of the rail transportation property than the ratio that the assessed value of other commercial and industrial property in the same assessment jurisdiction has to the true market value of the other commercial and industrial property.

(2) Levy or collect a tax on an assessment that may not be made under paragraph (1) of this subsection.

(3) Levy or collect an ad valorem property tax on rail transportation property at a tax rate that exceeds the tax rate applicable to commercial and industrial property in the same assessment jurisdiction.

barges and other vessels"). (Dkt. 63 ¶ 10, at 3.) I proceed through the two-step analysis first with respect to motor carriers and then with respect to water carriers.

## A. Motor Carriers

Like the majority, I have no doubt that CSX has established a prima facie § 11501(b)(4) violation by showing that the sales and use taxes apply to rail carriers but exempt motor carriers. (Op. at 11–12.) Where I disagree is in the second step of the analysis: whether the State has justified the differential treatment.

The State explains the exemption by pointing out that motor carriers must pay the 19¢ state excise tax per gallon of fuel they purchase. Rail carriers do not pay this tax. According to the State's argument, the fact that rail carriers are not subject to the excise tax justifies the differential treatment in the sales and use taxes, and the sales and use taxes do not discriminate against rail carriers.

The district court agreed with the State. *CSX Transp., Inc. v. Ala. Dep't of Revenue*, 892 F. Supp. 2d 1300, 1312–14 (N.D. Ala. 2012) (*CSX III*). The court compared the state sales and use taxes (measured in terms of what rail carriers paid per gallon of fuel, including the 4% tax) to the state motor-fuel excise tax (measured in terms of what motor carriers paid per gallon, including the 19¢-per-gallon tax) assessed from January 2007 to December 2009. *Id.* at 1313. The court found that "motor carriers actually pa[id] a higher" state tax. *Id.* Even adding to

20

the comparison the additional sales and use taxes imposed on rail carriers by counties and cities in Alabama, motor carriers and rail carriers paid "substantially similar" taxes during the period in question.  *Id.*[2]  And that comparison failed to incorporate the motor-fuel excise taxes assessed by counties and cities on motor carriers, which ranged from 1¢ to 6¢ added to the state excise tax imposed on motor carriers.  *Id.*  In sum, the district court found, the taxes paid by rail carriers and motor carriers for fuel was "essentially the same."  *Id.*  Because its findings are not challenged on appeal, I accept them as accurate.

None of these findings are relevant, CSX argues, because the State cannot justify differential treatment by showing that the entities that are exempt from sales and use taxes are subjected to a separate tax not imposed on rail carriers.  The majority agrees with CSX's position.  It refuses to compare the two taxes, regardless of the numbers the taxing arrangement yields.  (*See* Op. at 12.)  But based on my reading of the Supreme Court's opinion in *CSX II* and case law in other circuits, I find this position both unsupported and contrary to Congress's intent.

CSX's argument and the majority opinion follow the approach taken by the Eighth Circuit in *Union Pacific Railroad Co. v. Minnesota Department of Revenue*,

---

[2] I assume that sales and use taxes imposed by cities and counties are at issue in this case. Given that CSX named no city or county as a defendant, this assumption may not be true; I hesitate to agree that a city or county can be enjoined from imposing a tax when it has not been named as a party.  But even if they can, my conclusion remains the same.

507 F.3d 693 (8th Cir. 2007). There, the Eighth Circuit considered Minnesota's generally applicable sales tax on railroad fuel that exempted two primary competitors (motor carriers and air carriers) because they paid a separate excise tax, *see id.* at 694—a scenario nearly identical to the one confronting us here. Based on its earlier opinion in *Burlington Northern, Santa Fe Railway Co. v. Lohman*, 193 F.3d 984 (8th Cir. 1999), the Eighth Circuit refused to consider any other tax as a justification for the facial discrimination. *See Union Pac.*, 507 F.3d at 695 ("[W]e 'look only at the sales and use tax with respect to fuel to see if discrimination has occurred.'" (quoting *Lohman*, 193 F.3d at 986)).

But as the district court recognized, *see CSX III*, 892 F. Supp. 2d at 1310–11, the Eighth Circuit's simplistic approach to evaluating challenges under § 11501(b)(4) incorrectly relies on distinguishable case law. *Lohman*, on which *Union Pacific* rests, refuses to consider other taxes as justification for facially discriminatory tax treatment. 193 F.3d at 986. The *Lohman* court relies on two cases for the proposition that the fairness of this tax scheme is "too difficult and expensive to evaluate," *id.*: the Fifth Circuit's opinion in *Kansas City Southern Railway Co. v. McNamara*, 817 F.2d 368 (5th Cir. 1987), and the Eighth Circuit's own opinion in *Trailer Train Co. v. State Tax Commission*, 929 F.2d 1300 (8th Cir.

1991).[3]  But both *McNamara* and *Trailer Train* address a materially distinct fact pattern, and their analyses are unsuitable for this case.

In *McNamara* and *Trailer Train*, the court considered a different kind of tax—a specific tax that "targeted" railroads for differential treatment,[4] rather than a general tax that exempted railroads' competitors.  In each case, the court decided that the appropriate comparison class consisted of *all commercial and industrial taxpayers*.  In each case, the state argued that the tax did not discriminate against railroads because the state's tax structure, *as a whole*, treated railroads similarly to every other commercial and industrial taxpayer.  And in each case, the court refused to entertain such a searching, time-consuming, expensive, and impracticable analysis.  *See Trailer Train*, 929 F.2d at 1302–03; *McNamara*, 817 F.2d at 377–78.

Here, we have a much narrower issue.  The appropriate comparison class includes the two stipulated competitors—a far more manageable class than one composed of all commercial and industrial taxpayers in Alabama.  And in arguing that a single tax on motor carriers justifies their exemption from another tax, the State does not come close to proposing the massive endeavor that *Trailer Train*

---

[3] The majority opinion also applies *McNamara* and acknowledges *Trailer Train*.  (*See* Op. at 12–14.)

[4] In *McNamara*, Louisiana imposed a tax on "public utilities," a relatively small group of taxpayers that included railroads.  817 F.2d at 374.  Notably, "public utilities" also included certain motor and water carriers.  *Id.*  In *Trailer Train*, Missouri taxed an activity in which only railroads engaged.  929 F.2d at 1302.

and *McNamara* refused to undertake.  Like the district court, *see CSX III*, 892 F. Supp. 2d at 1310–11, I would distinguish *Trailer Train* and *McNamara* on that ground, and I would decline to follow *Lohman*'s and *Union Pacific*'s lead because they rely on those distinguishable cases.

That we must evaluate the State's justification, despite the Eighth Circuit's approach, is all the clearer after *CSX II*.  There, the Court conceded that discrimination cases under the 4-R Act will often "raise knotty questions about whether and when dissimilar treatment is adequately justified." *CSX II*, 131 S. Ct. at 1114.  But as the Court then insisted, "Congress has directed the federal courts to review a railroad's challenge[,] and . . . we would flout the congressional command were we to declare the matter beyond us." *Id.*

Perhaps the most compelling reason to depart from the Eighth Circuit's approach is that, under that approach, we may reach the bizarre holding that a tax discriminates against a rail carrier even though the tax puts the rail carrier at no discernible disadvantage.  The majority opinion reaches just that result, concluding that the sales and use taxes discriminate against rail carriers and in favor of motor carriers even though motor carriers pay "essentially the same" tax on their fuel. (*See* Op. at 12 (refusing to evaluate the comparison between the two taxes "even though in some years . . . the State's taxing arrangement might yield a fair result").)    Under the majority's approach, the sales and use taxes would

discriminate against a rail carrier even if its competitors paid four times as much tax as the rail carrier for the same commodity.

I cannot agree with that approach. Congress created the 4-R Act to stabilize railroads financially. *Dep't of Revenue v. ACF Indus., Inc.*, 510 U.S. 332, 336, 114 S. Ct. 843, 846 (1994). This goal implies that an offending tax must disadvantage railroads; I fail to see how a tax that places rail carriers in the same tax position as their competitors—or a better one—could threaten railroads' financial stability. So it is clear to me that Congress enacted § 11501(b)(4) to eliminate tax schemes that impose a greater tax burden on railroads than other taxpayers. This purpose is explicit in the first three subsections of § 11501(b), each of which prohibits taxation methods that assess or tax rail carriers' property at a *higher rate* than other taxpayers. *See* § 11501(b)(1)–(3). By outlawing "another tax that discriminates" in the final subsection, Congress specifically targeted taxes that have a similar effect as those referred to in the previous three—placing a greater tax burden on railroads than other taxpayers for the same taxable item or event. In finding discrimination against rail carriers without determining whether rail carriers have actually been disadvantaged, the majority opinion flouts the language of the statute and Congress's clear intent.

Turning now to the State's justification, I agree with the district court that the State has met its burden to show that the tax exemption for motor carriers was not discriminatory against railroads.

As I explained above, a tax discriminates against railroads in violation of § 11501(b)(4) if the tax imposes a greater tax burden on railroads than it does on comparable taxpayers. The district court found that rail carriers paid *less* state tax on fuel than motor carriers during the period in question and that, even adding the local taxes imposed on rail carriers (and without adding local excise taxes paid by motor carriers), rail carriers and motor carriers paid "essentially the same" tax. *CSX III*, 892 F. Supp. 2d at 1313. These factual findings are not challenged on appeal. And I cannot conclude from these findings that railroads have been competitively disadvantaged in any way by the sales and use taxes' exemptions for motor carriers.[5] I would hold that the State has met its burden to justify the

---

[5] CSX contends that, even if rail carriers face the same tax burden as motor carriers in terms of purchasing and consuming fuel, rail carriers are still disadvantaged because they must maintain their own rights-of-way (tracks) while motor carriers' rights-of-way (highways) are maintained in part by the excise taxes they pay. CSX argues that the district court's refusal to consider these uneven operating expenses in its comparison to the two taxes, *see CSX III*, 892 F. Supp. 2d at 1314–15, was error because any analysis of relative tax burdens must include an analysis of the tangible benefits received or not received.

I disagree. True, railroads have to maintain their tracks. But that burden is not a *tax* burden that the 4-R Act prohibits, and no tax affects that burden. Say, for example, that the State eliminated both the motor-fuel excise tax and the motor-carrier exemptions in the sales and use taxes, leaving a system in which rail carriers and motor carriers paid identical 4% taxes on the purchase and use of their fuel. By CSX's logic, even that totally equal tax scheme would disadvantage railroads in violation of the 4-R Act because railroads have higher overhead

differential treatment and, therefore, that the tax exemption does not discriminate against rail carriers within the meaning of § 11501(b)(4).

## B.  Water Carriers

The district court held that the sales and use taxes' exemptions for water carriers did not discriminate against rail carriers in violation of the 4-R Act, in part because CSX "fail[ed] to meet it[s] evidentiary burden of proof."  *CSX III*, 892 F. Supp. 2d at 1316.  This conclusion is not entirely unreasonable; after all, the Supreme Court in *CSX II* did hint that the rail carrier must "prove the alleged discrimination" to prevail.  *CSX II*, 131 S. Ct. at 1109 n.8 ("Whether the railroad will prevail—that is, whether it can prove the alleged discrimination—depends on whether the State offers a sufficient justification . . . .").

But the district court required too much of CSX.  The rail carrier bringing a § 11501(b)(4) claim can establish its prima facie case simply by showing that the tax in question exempts competitors.  *See id.* at 1108 (noting that a state discriminates against one group of taxpayers by charging them a higher tax rate than another group).  It then becomes the state's burden to show that the tax did not

---

expenses.  Motor carriers still would not be responsible for maintaining the public highways of Alabama.

The difference in right-of-way maintenance costs has no place in the comparison of tax burdens.  That railroads must pay for their own tracks is the inherent burden of operating a transportation network on private rights-of-way.  In other words, it is a fundamental competitive disadvantage that railroads face.  Congress did not intend the 4-R Act to eliminate *all* of railroads' competitive disadvantages, only those created by taxes.  And here, the State has shown that the sales and use tax exemptions for motor carriers creates no tax disadvantage for railroads.

in fact discriminate against the railroad.  *See id.* at 1109 n.8 ("[W]hether [the railroad] can prove the alleged discrimination[ ]depends on whether the State offers a sufficient justification . . . .").

In requiring more from CSX than a showing that the tax exempts water carriers, the district court muddied the two-step inquiry and applied an incorrect legal standard.  When a district court uses the wrong legal standard, we can remand for application of the appropriate standard.  *See Kearse v. Sec'y, Fla. Dep't of Corr.*, 669 F.3d 1197, 1198 (11th Cir. 2011).  Accordingly, I would remand this case so the district court can apply the correct standard (based on the existing record) and determine whether the State has offered sufficient justification for the tax exemption given to water carriers.